Karen Somersall et al., Infants, by Sylvia Collins, Individu-
ally and as Natural Guardian, et al., Respondents, v New
York Telephone Company, Appellant, et al., Defendant.

First Department, April 29, 1980

## APPEARANCES OF COUNSEL

*Robert C. Myers* of counsel *(Charles Franklin Richter* and *Charles Chehebar* with him on the brief; *Dewey, Ballantine, Bushby, Palmer & Wood,* attorneys), for appellant.

*Samuel J. Sussman* of counsel *(Hoberman, Sussman, Bloom & Reich, P. C.,* attorneys), for Sylvia Collins and another, respondents.

*Herman Schmertz* of counsel *(Gair, Gair & Conason,* attorneys), for Gertrude Thomas, respondent.

*Michelle Turchin* of counsel *(Bauman, Greene & Sims, P. C.,* attorneys), for Sheryn Meyers and another, respondents.

MURPHY, P. J.

This is a consolidated action to recover damages for wrongful death and personal injuries. The occurrence took place at 3:35 P.M. on August 31, 1974, a sunny and clear day, when defendant Quilter drove his Lincoln Continental on the sidewalk and struck the plaintiffs. At a trial limited to the issue of liability, Quilter was found to be 70% responsible for the damages. Defendant New York Telephone Company (Telephone) was held 30% responsible by reason of the fact that one of its vehicles was double-parked on the street at that time. Telephone now appeals.

Quilter did not testify at trial; portions of his deposition were read into evidence. Quilter had a New York State learner's permit; he had driven in this State on two or three occasions prior to August 31, 1974. When he resided in Honduras in 1970, he also had a learner's permit. He operated a vehicle several times in that country.

Quilter's car was a 1968 Lincoln Continental; it was 19 feet long and 6 feet wide. The Continental was parked between two other automobiles on the northerly curb of 118th Street between Seventh Avenue and Lenox Avenue. Traffic on 118th Street proceeded in an easterly direction. A repair truck, owned and operated by Telephone, was double-parked approximately a "car and one-quarter" to a "car and one-half" in front of the Continental. The truck was about 12 feet long, 12 feet high and 7 feet wide. The street is 29 feet wide at the place of the occurrence. There was a distance of about 16 feet from the right side of the truck to the southerly curb of 118th Street.

In the course of his deposition, Quilter testified as to "when" he first saw the truck and "how" the accident happened. Since Quilter's explanation of the event is far from lucid, relevant portions of his testimony will be set forth herein:

"Question: At that time when you came back home, did you see a Telephone Company truck double parked on the street?

"Answer: I seen the—I went in the house and leave the goods, what I want shopping, when I got to the car and started going forward, I seen the truck. * * * I backed the car out just to clear it from the car in front of me and angled and started to put the parking, the other side, when I saw the truck in front of me, right. I tried to get away from the truck and I

was already on the sidewalk. The sidewalk was pretty near from where the truck was. * * *

"Question: Can you tell how far you turned the steering wheel to the right?

"Answer: I can't tell exactly. I know I turned it enough to get away from the car in front of me and I tried to get around the truck.

"Question: When you say, the truck, you mean the double parked telephone truck?

"Answer: Yes.

"Question: Did you have to turn more than you would have turned it if the telephone truck had not been there?

"Answer: The truck wasn't there, I wouldn't have had to turn it as far as I did.

"Question: Did you turn it more because of the telephone truck?

"Answer: Yes, to get away from it. It was in line with the other car in front. I wouldn't have to turn because I would have cleared it already."

After the occurrence, Quilter signed a witness statement that his gas pedal and steering wheel had stuck. Officer DeLuca, a member of the Accident Investigation Squad, stated that an examination of the Continental failed to reveal any defect in the gas pedal or the steering wheel. It was DeLuca's opinion that Quilter lost control of the vehicle as a result of his inexperience.

William August, Quilter's brother-in-law, was a passenger in the Continental. He gave a different account of the occurrence from that of Quilter. August testified that Quilter (i) had backed the vehicle in the space, (ii) turned the steering wheel to the right in order to exit the space, and (iii) proceeded in a straight line to the sidewalk on the south side of 118th Street. August stressed that the Continental did not turn left or right after leaving the space nor did it come near the repair truck.

The repair truck was manned by two employees. They had been dispatched to repair a telephone cable in an abandoned building on Lenox Avenue. The truck had been double-parked for approximately two and one-half hours before the occurrence. One repairman, Walker, testified that he and his partner had returned to the truck on one occasion that afternoon to obtain tools. He also asserted that cables were run from the building to the truck to use the truck's generator as a power

source. Other witnesses testified that they did not see any cables either before or after the occurrence.

During the course of the trial, the court recalled plaintiff Karen Somersall. Over the defense attorney's objections, the court questioned the child about the fact that she had lost a leg in the accident. To the extent here relevant, the court later gave the following charge: "Now, you have to make a determination whether or not this was, this truck was being used as a source of power to make a repair. There is no question at all that the Telephone Company had a perfect right to be there in that area to make repairs to telephone lines. That is part of their function. Whether or not the double parking of the truck was necessary to make these repairs, whether they needed the light and the power from this truck, is something for you to determine. If you find that they did, of course, then this is not considered negligence per se. If you find that they did not need this truck and that it was merely a convenience for the Telephone Company employees to leave their truck there and go about their business, and that they took no power at all from this truck, then, of course, it is double parked in violation of law. You make that determination. This is up to you to determine when you determine and analyze the facts in this particular case.

"The fact that it is parked in violation, if you so find, is negligence. But this is still not enough to hold the New York Telephone Company in this particular case, and I will explain that later into going into the elements of what the plaintiffs have to establish".

As was mentioned in the opening paragraph the jury found Quilter 70% liable and Telephone 30% liable for damages. In a written decision, the trial court denied Telephone's posttrial motions for judgment. In considering the issues raised upon this appeal, the evidence will be viewed most favorably to the plaintiffs. For this court to conclude as a matter of law that the verdict was not supported by the evidence, it will be necessary to conclude that the jury could not have reached that determination through any rational process upon the evidence presented (Cohen v Hallmark Cards, 45 NY2d 493, 499).

The first issue presented is whether the truck was lawfully double-parked. Section 1642 (subd [a], par 2) of the Vehicle and Traffic Law authorizes the City of New York to promulgate its own traffic regulations as to parking, standing and

stopping. Section 81 (subd [c], par 2) of its regulations has replaced section 1202 (subd [a], par 1, cl a) of the Vehicle and Traffic Law with regard to double-parking restrictions. Section 190 of New York City Traffic Regulations specifically states that section 1202 of the Vehicle and Traffic Law has been superseded and is not effective within New York City (cf. *Giordano v Sheridan Maintenance Corp.*, 38 AD2d 552, 553). Therefore, subdivision (c) of section 81 of the regulations will be substituted for subdivision (a) of section 1202 of the Vehicle and Traffic Law in the text of subdivision (b) of section 1103 of the Vehicle and Traffic Law.

Subdivision (b) of section 1103 reads as follows: "(b) Unless specifically made applicable, the provisions of this title shall not apply to persons, teams, motor vehicles, and other equipment while actually engaged in work on a highway nor shall the provisions of subsection (a) of section twelve hundred two apply to hazard vehicles while actually engaged in hazardous operation on or adjacent to a highway but shall apply to such persons and vehicles when traveling to or from such hazardous operation. The foregoing provisions of this subdivision shall not relieve any person, or team or any operator of a motor vehicle or other equipment while actually engaged in work on a highway from the duty to proceed at all times during all phases of such work with due regard for the safety of all persons nor shall the foregoing provisions protect such persons or teams or such operators of motor vehicles or other equipment from the consequences of their reckless disregard for the safety of others."

The first sentence in subdivision (b) of section 1103 of the Vehicle and Traffic Law has two identifiable classes. The first class (hereinafter "work class") includes vehicles while actually engaged in work on a highway. The "work class" is exempted from all provisions of title 7 unless the provisions are specifically made applicable to it. The second class (hereinafter "hazard class") includes hazard vehicles while actually engaged in hazardous operation on or adjacent to a highway. However, the "hazard class" is only exempt from the provisions of subdivision (a) of section 1202 of the Vehicle and Traffic Law or, under the substitution made above, from the provisions of subdivision (c) of section 81 of the regulations. Moreover, the statute stresses that the provisions of subdivision (c) of section 81 shall apply to the "hazard class" when traveling to or from such "hazardous operation".

■ There is no dispute that Telephone's repair truck falls within the definition of a "hazard vehicle" (Vehicle and Traffic Law, § 117-a). The difficulty in this proceeding arises with regard to the subissue of whether the repair truck was engaged in a "hazardous operation on or adjacent to a highway." Section 117-b of the Vehicle and Traffic Law defines "hazardous operation" as follows: "The operation, or parking, of a vehicle on or immediately adjacent to a public highway while such vehicle is actually engaged in an operation which would restrict, impede or interfere with the normal flow of traffic." The trial court interpreted the phrase "actually engaged" to require that the repair truck be integrally involved in the repair process. The court charged that the truck could only be exempt from section 81 (subd [c], par 2) of the regulations if it were being used as a power source. The court's construction of section 117-b and subdivision (b) of section 1103 was too restrictive.

The Legislature did not define the terms "actually engaged" and "operation", as they are used in section 117-b of the Vehicle and Traffic Law. In defining those terms, this court will necessarily solve the difficulties presented under the first issue.

As a starting point, it is important to reiterate the different treatment accorded the "work class" and the "hazard class" under subdivision (b) of section 1103 of the Vehicle and Traffic Law. The "work class" was exempted only when performing work on a highway. The Legislature limited the exemption accorded the "hazard class" to a "hazard operation on or adjacent to a highway." A "hazardous operation", under section 117-b of the Vehicle and Traffic Law requires that the "vehicle is actually engaged in an operation which would restrict, impede or interfere with the normal flow of traffic." It may be inferred from the Legislature's choice of language that it was taking cognizance of the fact that a utility "operation" might take place "off" the highway but might still affect traffic on a highway. Phrased differently, the Legislature chose not to define "hazard operation" in such narrow terms as to preclude an exemption for a utility vehicle if repair work was done "off the highway". Hence, in this proceeding, the repair truck is not necessarily barred from an exemption because the repair work took place in a building. Furthermore, under subdivision (b) of section 1103, the "hazard class" is not exempt when traveling to or from a "hazardous opera-

tion." By implication, the Legislature exempted the "hazard class" when performing work at a job site.

There are additional reasons for believing that the Legislature intended to exempt a double-parked utility truck even if the actual repair work was being performed in an adjacent building. First, utility repairmen in New York City would lose valuable time while they searched for a "legal parking space" if they could not double-park their trucks. All factors considered, the best interests of the populace are served by permitting utility repairmen to double-park when making repairs in a building. Second, as a practical matter, repairmen could never foresee whether a generator or specialty tools would be needed to make repairs on any particular job. Consequently, the repair truck and its facilities must remain available to assist the repairmen as eventualities develop.

In this background, the word "operation" must be read in the broader sense to encompass "all activities associated with the repair operation". That term should not be narrowly construed to the "physical act of repairing a cable". To the extent that the repair truck was part of the activities associated with the repair of the cable, the truck was "actively engaged" in the utility "operation". It was unnecessary for Telephone to show that the truck was actually used at all during the period repairs were made; the important consideration is that the truck was available if needed.

As part of the "operation", the truck double-parked and restricted traffic. However, under subdivision (b) of section 1103 and section 81 (subd [c], par 2) of the regulations, its restriction of traffic was authorized and lawful. Therefore, the double-parking in this case was not evidence of any negligence on the part of Telephone.

Plaintiff's reliance on *Petosa v City of New York* (52 AD2d 919) and *Kallasy v New York Tel. Co.,* (70 AD2d 749) is misplaced. *Petosa* dealt with the "work class"; thus, it involved a different criterion from the one applied to the "hazard class" in this case. *Kallasy* contained a brief mention of subdivision (a) of section 1201 of the Vehicle and Traffic Law; the discussion in this case has centered upon subdivision (a) of section 1202 of the Vehicle and Traffic Law as replaced by subdivision (c) of section 81 of the regulations.

It should be emphasized that, although a utility vehicle is lawfully double-parked, it might still violate some other statute or regulation. For example, a lawfully double-parked

vehicle could violate section 375 (subd 41, par 3) of the Vehicle and Traffic Law by failing to display warning flags during the daytime. A finding that this violation occurred would be negligence as a matter of law. Since this proceeding was not submitted to the jury on any violation other than the double-parking one, the scope of review on appeal is limited to that one violation.

The second issue is whether Telephone's negligence was a concurrent proximate cause of the occurrence. For purpose of this discussion, it will be assumed that the repair truck was unlawfully double-parked on 118th Street.

Evidence of negligence is not enough by itself to establish liability. It must also be proved that the negligence was the cause of the event which produced the harm *(Sheehan v City of New York,* 40 NY2d 496, 501). The facts in each negligence action will determine whether a double-parking violation was the proximate cause of a pedestrian's injury. (See, generally, Liability of owner or driver of double-parked motor vehicle for ensuing injury, death, or damage, Ann. 82 ALR2d 726, 734, § 6). In some instances of double-parking, the courts have found sufficient facts to present the case to the jury *(Daly v Casey,* 38 NY2d 808; *Naeris v New York Tel. Co.,* 5 NY2d 1009); in other instances, the courts have dismissed the action for insufficiency of proof *(Maloney v Howard Johnson, Inc.,* 5 AD2d 1015; *Miller v Sinram Marnis Oil Co.,* 8 Misc 2d 1041; *Miraglia v Loiacono,* 205 Misc 232). The present action falls in the latter category of cases.

It is axiomatic that a person is bound to see what, by the proper use of his senses, he might have seen (41 NY Jur, Negligence, § 58). As a co-ordinate proposition, a driver parked along the side of a curb must exercise ordinary care when leaving the space and entering traffic. (3 Blashfield, Automobile Law and Practice, § 116.53.) Quilter's testimony that he did not see the repair truck until he began to exit the parking space is incredible as a matter of law. The photographs in evidence, plaintiff's Exhibit No. 7 and Telephone's Exhibit No. C, belie Quilter's contention in that regard. It would be virtually impossible for any individual, sitting in the parked Continental, not to see the mass of the truck to the right front. Moreover, those same photographs conclusively show that the Continental did not maneuver around the truck. The photographs show that the Continental proceeded in a straight line from the parking space to the southerly sidewalk.

Quilter's testimony that he wrestled with the steering wheel and that he partially passed the truck must bow to the controlling physical evidence that he did not do so.

■ Upon the evidence presented, the jury could not have found Telephone liable upon any rational consideration of the evidence. All facts point to the conclusion that Quilter lost control of his Continental. The presence of the truck was a mere "circumstance" of the accident (*Miraglia v Loiacono, supra,* at p 233); its presence was not a contributory factor to the accident (cf. *Natell v Taylor-Fichter Steel Constr. Co.,* 257 App Div 764, affd 283 NY 737).

■ The third issue is whether the trial court erroneously charged that a violation of the New York City double-parking regulations was negligence as a matter of law. A violation of a traffic regulation is merely some evidence of negligence. Even though the counsel for Telephone failed to object to this portion of the charge, this error was fundamental and would require the grant of a new trial if this action were not being dismissed (*Rodriguez v Cato,* 63 AD2d 922).

■ The final issue is whether the trial court erred in eliciting from plaintiff Karen Somersall that she lost a leg in the accident. This trial was limited to the issue of liability. Consequently, Somersall's testimony on this point of damages was totally irrelevant and could only have served to arouse the jury's sympathies in her favor. The admission of this testimony may have precluded a fair consideration of the evidence by the jury and it is thus reversible error. If this action were not being dismissed, a new trial would be ordered on this added ground.

For the foregoing reasons, the interlocutory order and judgment (one paper) of the Supreme Court, New York County (ASCIONE, J.), entered December 12, 1978, granting judgment to plaintiff after a jury trial by apportioning liability in the amount of 70% against defendant Quilter and 30% against defendant New York Telephone Company, should be modified, on the law, the complaint should be dismissed as against defendant New York Telephone Company and defendant Quilter should be held 100% liable, and, as modified, the interlocutory order and judgment should be affirmed, without costs. Since defendant Quilter did not appeal, he acquiesced in the interlocutory order and judgment against him. Therefore, no affirmative relief will be accorded to him on this appeal.

FEIN, J. (concurring). I agree with Presiding Justice MURPHY that even if it be assumed that New York Telephone was negligent in double parking its truck in violation of the pertinent statutes and regulations, such negligence was not a proximate cause of the accident and that accordingly the complaint as against New York Telephone must be dismissed.

Although I do not agree with Justice MURPHY's analysis and application of the pertinent provisions of the Vehicle and Traffic Law and New York City Traffic Regulations, I concur that the jury instructions with respect thereto were erroneous. This would require a new trial were we not dismissing the complaint. I agree with Justice KUPFERMAN's comments with respect to the testimony that one of the plaintiffs lost a leg in the accident. I know of no reason why this limited evidence should be kept from the jury, even on a trial limited to the issue of liability. The split trial authorized by CPLR 603 is designed to save time and expense, in a negligence case the time and money involved in medical testimony. Upon a full trial, juries are deemed competent to decide the issues of liability and damages together, subject to appropriate instructions that the liability issue must first be resolved irrespective of the nature and extent of the injuries. If this time-honored, customary practice is deemed acceptable, the limited revelation of the ultimate injury sustained by the plaintiff here should not be considered reversible error, if error it be.

The complaint as against New York Telephone should be dismissed and interlocutory judgment entered finding defendant Quilter 100% liable.

KUPFERMAN, J. (dissenting). The majority opinion well analyzes the situation. However, by a strained construction, with which I cannot agree, it finds that for all practical purposes, a "hazard vehicle" engaged in a nonhazardous operation is exempt from normal double-parking rules.

More troublesome is the question of proximate cause and foreseeability. Obviously, if you are parked against the curb with a double-parked truck in front of you, there must be maneuvering to get around the truck.

We have here a very simple situation in which the jury by its determination (in the light most favorable to plaintiffs, *Osipoff v City of New York,* 286 NY 422) found that the telephone repair truck was unnecessarily double-parked. Accordingly, the defendant Quilter had to overcompensate in

order to move from his parking place, and, as a result drove into the plaintiffs. The jury understood who was primarily at fault and thus found that Quilter was 70% responsible, while the defendant telephone company was only 30% responsible. The issue of proximate cause was for the jury *(Commisso v Meeker,* 8 NY2d 109.)

With respect to the issue of eliciting from one plaintiff that she lost a leg in the accident, CPLR 603, which provides for bifurcated trial, does not mean that the jury is kept in the dark with respect to the nature of the claim. See Practice Commentaries to section 603 by Professor Joseph M. McLaughlin (McKinney's Cons. Laws of NY, Book 7B, CPLR). In any event, the jury could not help but know that extensive damage to various plaintiffs had taken place.

I would affirm.

BIRNS and MARKEWICH, JJ., concur with MURPHY, P. J.; FEIN, J., concurs in an opinion; KUPFERMAN, J., dissents in an opinion.

Interlocutory judgment and order (one paper), Supreme Court, New York County, entered on December 12, 1978, modified, on the law, and the complaint dismissed as against defendant New York Telephone Company, and defendant Quilter held 100% liable, and, as modified, the interlocutory order and judgment are affirmed, without costs and without disbursements.