OPINION OF THE COURT
Francis T. Collins, J.
At approximately 7:30 a.m. on the morning of December 7, 1991, claimants departed their residence in Rome, New York, in their 1991 Chevrolet pickup truck to travel to Buffalo to at *132 tend the christening of a grandson. Mr. McDonald drove until claimants reached Watertown where they stopped for breakfast. Mrs. McDonald took over operation of the vehicle when they resumed their trip. Claimants proceeded south on Interstate Route 81. At approximately 10:00 a.m., claimants’ vehicle was approaching Interchange 38. Route 81 at Interchange 38 is a four-lane divided highway running generally north and south with two lanes of travel in each direction. As a vehicle traveling south on Route 81 approaches the exit ramp of Interchange 38 there is a bend in the road. Claimants’ vehicle was in the driving lane followed by a pickup truck operated by Robert L. Bermond, which was in turn followed by an automobile operated by William Grey.[2] The Bermond vehicle was approximately 200 feet to the rear of claimants’ pickup truck and the Grey automobile was approximately 600 feet to the rear of the Bermond vehicle. The weather conditions consisted of a mixture of rain and snow with slush in the passing lane.
As Mrs. McDonald proceeded past the exit ramp and around the bend she observed a snowplow heading in a southerly direction. Half of the snowplow was in the driving lane and the other half was within the Interchange 38 entrance ramp to Route 81. A U-turn area is located in the highway median just south of the Interchange 38 entrance ramp. The snowplow began to merge from the entrance ramp into the driving lane and, upon seeing the snowplow, Mrs. McDonald moved her vehicle into the passing lane, as did the two vehicles following her. Claimants were traveling at approximately 50 miles per hour due to the adverse weather conditions and testimony established that the snowplow was traveling at a somewhat slower rate of speed. As the vehicles proceeded south on Route 81, the operator of the snowplow veered her vehicle sharply to the left across the passing lane in an attempt to enter the U-tum and then proceed north on Route 81. Claimants’ vehicle struck the rear of the snowplow resulting in personal injuries to both claimants.
The claim seeks to recover for personal injuries and derivative loss upon a negligence theory. During the trial, claimants’ motion to amend the claim to allege that claimants sustained serious injuries as defined in Insurance Law § 5102 (d) was granted (CPLR 3016 [g]). At the close of the proof, defendant moved to dismiss upon the ground that claimants had not *133 established that the operator of the snowplow operated the vehicle in violation of the “reckless disregard for the safety of others” standard set forth in section 1103 (b) of the Vehicle and Traffic Law. That motion will now be addressed.
Subdivision (b) of section 1103 of the Vehicle and Traffic Law provides: “(b) Unless specifically made applicable, the provisions of this title, except the provisions of sections eleven hundred ninety-two through eleven hundred ninety-six of this chapter, shall not apply to persons, teams, motor vehicles, and other equipment while actually engaged in work on a highway nor shall the provisions of subsection (a) of section twelve hundred two apply to hazard vehicles while actually engaged in hazardous operation on or adjacent to a highway but shall apply to such persons and vehicles when traveling to or from such hazardous operation. The foregoing provisions of this subdivision shall not relieve any person, or team or any operator of a motor vehicle or other equipment while actually engaged in work on a highway from the duty to proceed at all times during all phases of such work with due regard for the safety of all persons nor shall the foregoing provisions protect such persons or teams or such operators of motor vehicles or other equipment from the consequences of their reckless disregard for the safety of others.”
The issue presented is whether the operator of a snowplow engaged in snow and ice removal upon a public highway is exempt from complying with the “rules of the road” set forth in title VII of the Vehicle and Traffic Law and may, therefore, only be held liable in a civil action for money damages arising from a motor vehicle accident upon a demonstration of a “reckless disregard for the safety of others”, rather than ordinary negligence. The difficulty in resolving this issue arises from the literal language of the statute when considered in relation to Vehicle and Traffic Law § 117-a which defines a hazard vehicle. Section 117-a defines such a vehicle as “[e]very vehicle owned and operated or leased by a utility, whether public or private, used in the construction, maintenance and repair of its facilities, every vehicle specially equipped or designed for the towing and pushing of disabled vehicles, every vehicle engaged in highway maintenance, or in ice and snow removal where such operation involves the use of a public highway and vehicles driven by rural letter carriers while in the performance of their official duties”. The first sentence of subdivision (b) of section 1103 appears to create two separate classes of vehicles, some of which are exempt from the provisions of title VII in its entirety *134 and some of which are subject to all of the provisions of title VII except for Vehicle and Traffic Law § 1202 (a). Indeed, just such a literal construction was applied by the First Department in the case of Somersall v New York Tel. Co. (74 AD2d 302, 307, revd on other grounds 52 NY2d 157) when it held: "The first sentence in subdivision (b) of section 1103 of the Vehicle and Traffic Law has two identifiable classes. The first class (hereinafter ‘work class’) includes vehicles while actually engaged in work on a highway. The ‘work class’ is exempted from all provisions of title 7 unless the provisions are specifically made applicable to it. The second class (hereinafter ‘hazard class’) includes hazard vehicles while actually engaged in hazardous operation on or adjacent to a highway. However, the ‘hazard class’ is only exempt from the provisions of subdivision (a) of section 1202 of the Vehicle and Traffic Law”.
Compounding the problem is that the second sentence of subdivision (b) of section 1103 imposes the lesser reckless disregard standard of care upon “any person, or team or any operator of a motor vehicle or other equipment” without mentioning hazard vehicles despite the reference to such vehicles in the sentence immediately preceding. The language of the statute will reasonably support two different analyses reaching opposite conclusions. The first, a strictly literal interpretation, would find hazard vehicles to be a discreet class of vehicle and require a conclusion that the failure to specifically include that class in the language imposing a lesser standard of care authorizes the application of ordinary negligence standards to vehicles within the “hazard” class. The second conclusion would depend upon an analysis of the purpose and legislative history of section 1103 (b) and the application of rules of statutory construction. The primary concern of all statutory construction is to discern and implement the intent of the Legislature (McKinney’s Cons Laws of NY, Book 1, Statutes § 92). A construction which would result in absurdity is to be rejected (McKinney’s Cons Laws of NY, Book 1, Statutes § 145) and, further, the legislative history may be looked to for guidance in interpreting a statute which is ambiguous (McKinney’s Cons Laws of NY, Book 1, Statutes § 125).
The court finds that the current language of Vehicle and Traffic Law § 1103 is ambiguous and a review of its purpose and legislative history and the application of the above rules of statutory construction is required.
Both Vehicle and Traffic Law §§ 1103 and 1104 (concerning “emergency vehicles” defined in Vehicle and Traffic Law § 101) *135 derive from a nationwide effort during the 1950’s, led by the National Committee on Uniform Traffic Laws and Ordinances, to secure adoption of the Uniform Vehicle Code in order to create greater uniformity in traffic rules both within and among the various States. During 1954, the Legislature passed a version of the Uniform Vehicle Code in which a portion of the current language of section 1103 appeared as follows:
“§ 113. Public officers and employees to obey title; exceptions, (a) The provisions of this title applicable to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles owned or operated by the United States, this state, or any county, city, town, district, or any other political subdivision of the state, except as provided in this section and subject to such specific exceptions as are set forth in this title with reference to authorized emergency vehicles.
“(b) Unless specifically made applicable, the provisions of this title shall not apply to persons, teams, motor vehicles, and other equipment while actually engaged in work upon the surface of a highway but shall apply to such persons and vehicles when traveling to or from such work.”
The Report of the New York State Joint Legislative Committee on Motor Vehicle Problems stated the purpose underlying the language of subdivision (a) was “that maximum safety on the roads requires that all vehicles observe the same rules”, with any exceptions to be narrowly drawn to meet public need (1954 NY Legis Doc No. 36, at 34). As to subdivision (b), the Report (at 34-35) states the intent of its language as follows: “Subsection (b) stipulates that, unless specifically made applicable, the provisions of the title shall not apply to persons, teams, motor vehicles and other equipment while they are actually engaged in work on the surface of a highway. This refers to those who build highways, repair or maintain them, paint the pavement markings, remove the snow, sand the pavement and do similar work. But the title does apply to such persons and vehicles when they are traveling to or from such work”.
Thus, from the outset the intent of the Legislature was that snowplows engaged in snow removal would be exempt from complying with general rules of the road. The 1954 legislation was vetoed by Governor Harriman in order to permit further study. Upon its reintroduction during the 1955 session the proposed language of subdivision (b) was altered as follows: “(b) Unless specifically made applicable, the provisions of this title shall not apply to persons, teams, motor vehicles, and *136 other equipment while actually engaged in work on a highway nor shall the provisions of subsection (a) of section twelve hundred two apply to vehicles operated by public service corporations while actually engaged in work on the installation or maintenance of public service facilities on or adjacent to a highway but shall apply to such persons and vehicles when traveling to or from such work.” (1955 NY Legis Doc No. 36, at 24.)
Despite extensive research, the court has been unable to locate any documentation explaining the legislative purpose in removing the reference to work on the surface of a highway and adding language exempting public service corporation vehicles from the stopping, standing or parking prohibitions set forth in Vehicle and Traffic Law § 1202 (a). The most logical explanation is that the Legislature intended a broad category of work vehicles to be exempt from title VII and provided a much more narrow exemption for public service corporation vehicles in order to permit the performance of necessary work. Be that as it may, when enacted in 1957 (L 1957, ch 698, § 4) section 1103 continued the language of the original 1954 legislation exempting vehicles actually engaged in work on a highway from the provisions of title VII of the Vehicle and Traffic Law as well as the 1955 language concerning Vehicle and Traffic Law § 1202 (a). This continuity leads the court to find that the Legislature intended that snowplows engaged in snow removal would be included within the title VII exemption as anticipated by the Joint Legislative Committee on Motor Vehicle Problems.
The current ambiguity did not arise until the passage of the Emergency Light Bill of 1970 (L 1970, ch 197), which was designed to address public confusion over the meaning of differing colored lights on certain authorized motor vehicles. Prior to its passage, it was legal for a police vehicle, tow truck or snowplow to use a flashing red light. To remedy the resulting confusion regarding the degree of deference and caution accorded various vehicles, the 1970 legislation created four categories of vehicles, each permitted a different colored flashing light. Then Attorney-General Louis J. Lefkowitz stated the following in his Memorandum to the Governor in support of the law (see, Bill Jacket, L 1970, ch 197):
“The purport of this bill is to definitely establish which vehicles are entitled to display various colored lights, indicating to motorists the degree of caution to be exercised when approaching such vehicles.
*137 “Red lights are authorized only for ambulances, police vehicles and fire vehicles.
“Amber lights are authorized only for hazard vehicles, such as tow trucks, snow plows, etc.
“Blue lights are authorized for motor vehicles owned by a member of a volunteer fire department or his family residing in the same household.
“Green lights are authorized for motor vehicles owned by a member of a volunteer ambulance service or by a member of his family.”
As part of the classification of vehicles according to permitted light colors the Legislature added section 117-a defining “hazard vehicles” (as set forth earlier in this decision) and “hazardous operation” which it defined as the “operation, or parking, of a vehicle on or adjacent to a public highway while such vehicle is actually engaged in an operation which would bring such vehicle within the definition of a hazard vehicle.” (Vehicle and Traffic Law § 117-b.) Additionally, section 1103 (b) was amended by replacing the term “vehicles operated by public service corporations” with “hazard vehicle”, and the language “work on the installation or maintenance of public service facilities” with “hazardous operation” (L 1970, ch 197, § 12). By incorporating the definition of hazardous operation into section 1103 the Legislature, inadvertently in this court’s opinion, removed the original basis for the exemption from section 1202 (a) added in 1957, in that hazardous operation specifically includes parking and operation of a vehicle in areas adjacent to a highway. It is this incongruity which resulted in the erroneous interpretation expressed in the Somersall case (74 AD2d 302, supra) that section 1103 now defined two mutually exclusive categories of vehicles, i.e., “work class” vehicles exempt from all of title VII and “hazard vehicles” exempt only from the parking, standing and stopping restrictions of section 1202 (a).
The difficulty with the statutory language was compounded in 1974 when the Legislature added the second sentence to section 1103 (b) (L 1974, ch 223), which imposes the reckless disregard standard of care upon “any person, or team or any operator of a motor vehicle or other equipment while actually engaged in work on a highway”, while omitting the terms “hazard vehicle” and “hazardous operation” from the sentence. The omission only strengthens the construction of two mutually exclusive categories of vehicles with the “work” class subject to the reckless disregard standard and the “hazard” class liable *138 under principles of simple negligence. Such a construction must, however, be avoided in that the broad definition of “hazard vehicle” set forth in Vehicle and Traffic Law § 117-a encompasses every vehicle engaged in highway maintenance in addition to the vehicle types more specifically enumerated therein, including snowplows. It is difficult to imagine that the Legislature intended vehicles performing maintenance duties would be outside the class of “work” vehicles exempted by section 1103 (b) from the provisions of title VII of the Vehicle and Traffic Law. Again, the Report of the Joint Legislative Committee on Motor Vehicle Problems expressed an intent that those exempted from the rules of the road contained in title VII include “those who build highways, repair or maintain them, paint the pavement markings, remove the snow, sand the pavement and do similar work” (1954 NY Legis Doc No. 36, at 34). Clearly vehicles engaged in maintenance functions, including ice and snow removal, should reasonably be found to be “engaged in work on a highway” and, therefore, exempt from title VII. To find otherwise would so unreasonably restrict the application of section 1103 (b) as to render its provisions a practical nullity.
Any interpretation concluding that section 1103 (b) contains two mutually exclusive classes of vehicles is further belied by the documents in the Bill Jacket to chapter 223 of the Laws of 1974. Former Attorney-General Louis J. Lefkowitz states in his Memorandum for the Governor: “The bill statutorily extends the standard of care presently applicable to drivers of authorized emergency vehicles under § 1104 of said law to persons engaged in maintenance and hazardous operations”. (Emphasis supplied.)
The Deputy Commissioner and Counsel of the Department of Motor Vehicles stated the following in his Memorandum to the Governor recommending approval of chapter 223: “Under present law the exceptions from the rules of the road appear to be absolute for vehicles engaged in work on a highway. For example, a snow plow could be operated well above the speed limit and through red lights or other traffic devices without regard for the safety of other persons without being in violation of the provisions of the Vehicle and Traffic Law. There is no present requirement that due regard be had for the safety of others, as there is with respect to the operation of authorized emergency vehicles which may disregard certain rules of the road. It would appear that, from a technical standpoint, this change is both desirable and necessary. Although vehicles *139 used in highway work must of necessity be exempted from certain traffic laws in order to perform their duties properly, such exemptions should be conditioned upon due regard for the safety of other persons and any injuries or damage caused by disregarding the safety of others should not relieve the operator from the consequences of such action.” (Bill Jacket, L 1974, ch 223.)
The legislative history of section 1103 (b), combined with the rules of statutory construction regarding the implementation of legislative intent and avoidance of an unreasonable result lead the court to conclude that a snowplow engaged in the task of plowing snow from a highway is a vehicle engaged in work on a highway and, therefore, subject to the “reckless disregard” standard of care prescribed therein.
In view of the legislative history demonstrating that the reckless disregard standard of care engrafted upon section 1103 (b) pursuant to chapter 223 of the Laws of 1974 was adopted from the preexisting standard applied to emergency vehicles contained in section 1104, the court concludes that the two sections should be construed in pari materia on the issue of defining that standard of care.
Recently, in the case of Szczerbiak v Pilat (90 NY2d 553, 556-557), the Court of Appeals set forth its interpretation of the “reckless disregard” standard of liability as follows: “Vehicle and Traffic Law § 1104 grants drivers of ‘authorized emergency vehicles’ a qualified privilege to disregard the ordinary rules of prudent and responsible driving * * * This ‘reckless disregard’ standard of liability was interpreted and applied by this Court in the companion decisions of Campbell v City of Elmira (84 NY2d 505) and Saarinen v Kerr (84 NY2d 494, supra). In Saarinen, we equated ‘reckless disregard’ with the well-established tort concept of recklessness, which we defined as the conscious or intentional doing of an act of an unreasonable character in disregard of a known or obvious risk so great as to make it highly probable that harm would follow, and done with conscious indifference to the outcome.”
The issues before the court are whether the reckless disregard standard of conduct should be applied to claimants in view of defendant’s failure to plead the qualified privilege of Vehicle and Traffic Law § 1103 as an affirmative defense, and, if so, did the conduct of the operator of the snowplow rise to that level. Claimants pleaded and pursued their case upon a theory of ordinary negligence. Defendant did not seek to inteiject the reckless disregard standard of care into the litiga *140 tion until the close of the evidence. In effect, defendant set a trap for claimants at odds with the current concept that pleadings are designed to prevent surprise and the prejudice resulting therefrom (CPLR 3018 [b]). Indeed, the first argument in claimants’ memorandum of law is that the defendant has waived the qualified immunity of Vehicle and Traffic Law § 1103 by failing to plead it as an affirmative defense.
The public policy underlying such a finding would be that if the more difficult standard for recovery was placed in issue from the outset of the litigation judicial resources and legal expense could be saved by prompt dispositive motions or, at the very least, a claimant or plaintiff having a more realistic view of the merit of his or her lawsuit. Be that as it may, the question of whether section 1103 has to be pleaded as an affirmative defense is not being decided in a precedential vacuum. Although the Second Department opinion in Romero v Romero (231 AD2d 460) lends some support to the position that Vehicle and Traffic Law §§ 1103 and 1104 should be interposed as affirmative defenses, that case was decided without reference to the Court of Appeals decision in Ferres v City of New Rochelle (68 NY2d 446). In Ferres, one of the issues before the Court was whether the defendant waived the protection of General Obligations Law § 9-103, which sets forth an intentional conduct requirement for recovery similar to the reckless disregard standard of sections 1103 and 1104, by failing to plead the statute as an affirmative defense. In rejecting that position, the Court of Appeals (at 450) held: “Before addressing the statute’s applicability, we consider plaintiff’s contention that defendant should be precluded from relying on General Obligations Law § 9-103 because it failed to plead it as an affirmative defense or to move for dismissal or summary judgment prior to trial. General Obligations Law § 9-103 is not an affirmative defense that must be pleaded (CPLR 3018 [b]; see, 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 3018.13). If the statute is applicable, its sole effect is to establish the substantive law defining the extent of the duty owed to plaintiff, and the facts, which arguably bring the case within the statute, are what plaintiff, himself, asserts — that he was injured at the entrance of the park while engaged in one of the included activities, bicycling. While it would have been better practice to raise the legal issue earlier by way of motion, defendant’s failure to do so did not, contrary to plaintiff’s contention, result in a waiver.”
The legal effect of Vehicle and Traffic Law § 1103 “is to establish the substantive law defining the extent of the duty *141 owed” to our claimants, and the facts that bring the case within the statute are what the claimants themselves allege — that they were injured in a collision with a State snowplow engaged in plowing snow upon a public highway. Applying the Ferres holding to this record results in a determination that Vehicle and Traffic Law § 1103 need not be pleaded as an affirmative defense.
Claimants’ second legal position that section 1103 is not applicable because the snowplow was not actually engaged in work on a highway at the time of the collision as it was in the process of “traveling to or from such hazardous operation” lacks merit. Section 1103 immunizes those workers actually engaged in snow removal (see, Petosa v City of New York, 52 AD2d 919, 920). The snowplow operator, Connie L. Grandjean, was not traveling to or from a hazardous operation at the time of the collision. She was halfway through completing her plowing “beat”,[3] which she described as entering the southbound lanes of Route 81 at the Department of Transportation station located in Adams, New York, and plowing the road surfaces until she made a U-turn near Interchange 38 in order to plow the northbound lanes of travel while returning to the Adams station.
The last argument posited by claimants is that Ms. Grand-jean’s operation of the snowplow rose to the level of recklessness. The facts before the court do not warrant such a holding. Mrs. McDonald testified that due to memory loss she could not describe the operation of the snowplow from the time that she traveled into the passing lane until the snowplow appeared “right in front of her”. Mr. McDonald testified that as a passenger he was not “acutely aware” of what was going on around him and that once his wife moved their vehicle into the passing lane he “did not observe the snowplow at all” until he saw it directly in front of his vehicle.
William Grey first observed the snowplow near the Interchange 38 exit ramp. The snowplow was partially in the driving lane and partially on the shoulder. As the three vehicles moved into the passing lane, they were traveling at approximately 45 to 50 miles per hour. The snowplow was traveling at 40 to 45 miles per hour. He observed the operator of the snowplow raise up the right wing plow and pull into the driving lane. The snowplow then veered across the passing lane while attempting to make a U-turn. While the revolving lights *142 on the snowplow were on, Mr. Grey testified that the operator of the snowplow failed to give a turn signal prior to the lane change.
Jeanine Bermond was a passenger in the vehicle directly behind the claimants’ pickup truck. The snowplow was in the driving lane when she first saw it. The snowplow did not attempt to pull over gradually into the passing lane, instead the operator of the snowplow made an abrupt turn into the passing lane. The flashing lights on the snowplow were on, but Mrs. Bermond does not remember seeing a turn signal prior to the collision.
Mr. Bermond stated that he first observed the snowplow in the driving lane traveling at approximately 40 miles per hour while spreading sand. The wing plow was in the process of plowing the right-hand shoulder of the road. He observed the snowplow start to lift the wing plow while he and the claimants were in the process of pulling into the passing lane. The claimants’ vehicle was 100 feet or less behind the snowplow when it pulled into the passing lane in an attempt to make a U-turn. He testified that all of the warning lights upon the snowplow were in operation, and he observed that the blinker signaling a left-hand turn was on prior to the time that the snowplow changed lanes. Without objection, Mr. Bermond expressed the opinion that a driver of his above average ability could possibly have avoided the collision.
Connie L. Grandjean testified that she received her class three operator’s license, which permitted her to drive a snowplow, at the beginning of 1990. She has received training from the Department of Transportation, in the solo operation of a snowplow. She left work at 1:30 p.m. on December 6, 1991. At 4:00 a.m. on the morning of December 7, 1991, she received a call to report to work because it was snowing. She arrived at work at 5:00 a.m. and was told the truck and route that she would be working. She inspected the truck, loaded it with salt and sand, and began to plow her beat which included Route 81 south of the Department of Transportation station at Adams to the U-turn at Interchange 38 and then north on Route 81 returning to Adams. It takes approximately one hour to cover her beat, and she had completed four or five beats prior to the accident. The snowplow was equipped with three plows that were operated by nine separate controls. Just prior to the accident Ms. Grandjean was heading south on Route 81 at approximately 35 miles per hour approaching Interchange 38 while plowing the driving lane. Her headlights and flashing *143 lights were on. Her vehicle was equipped with two side-view mirrors on the driver side and two side-view mirrors on the passenger side. As Ms. Grandjean approached the off ramp at Interchange 38 she lifted her wing plow and checked for traffic. She put on her left directional signal, checked her side-view mirrors, and saw no traffic behind her. After observing it was clear she “cut over to catch the U-turn”. She never observed any traffic behind her prior to the impact. As she was turning into the U-turn she “felt a bump”, stopped to see what had happened and discovered that claimants’ vehicle had struck the rear of the snowplow.
There is no question that the claimants have established that Ms. Grandjean was negligent in failing to observe their vehicle prior to making a lane change. However, Ms. Grand-jean’s operation of the snowplow did not rise to a “reckless disregard for the safety of others” within the meaning given that term by the Court of Appeals. Ms. Grandjean made an improvident determination to attempt a U-turn. Her observation of traffic through her side-view mirrors did not disclose any other vehicles in the vicinity. Whether this failure to observe resulted from a blind spot or inattention, there certainly was no decision on Ms. Grandjean’s part “to ignore a grave risk, which is likely to result in harm to others” (Campbell v City of Elmira, 84 NY2d 505, 511; see also, Rouse v Dahlem, 228 AD2d 777). All of the warning lights upon the snowplow were in operation. The court finds credible the testimony of Ms. Grandjean and Mr. Bermond that the left-hand turn directional signal was in operation on the snowplow prior to the attempted U-turn. This accident occurred due to the negligent operation of the snowplow by Ms. Grandjean in failing to see what was there to observe, but that failure did not rise to the level of a reckless disregard for the safety of others so as to warrant a recovery by claimants. The court further finds no culpable conduct on the part of the claimants which contributed to the collision. As a consequence, the defendant’s motion to dismiss will be granted, and the defendant’s counterclaim for property damage to the snowplow dismissed.

. In this opinion “driving lane” shall refer to the right-hand lane of travel for one proceeding south on Interstate Route 81, and “passing lane” shall refer to the left-hand lane.

. All quotations are from the court’s trial notes.